**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PATRICK DUNCAN, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.  14-1305 |
| THE CHESTER COUNTY HOSPITAL, | : | |
| | : | |
| Defendant. | : | |

**<u>MEMORANDUM</u>**

STENGEL, J.                                                                                      March 29, 2016

Currently pending before the Court are the Motion for Partial or Full Summary Judgment[1] by Plaintiff Patrick Duncan ("Plaintiff") and the Motion for Summary Judgment by Defendant Chester County Hospital ("Defendant").  For the following reasons, Plaintiff's Motion for Partial or Full Summary Judgment is denied, and Defendant's Motion for Summary Judgment is granted.

## I.     FACTUAL BACKGROUND[2]

---

[1] Plaintiff moved "for partial summary judgment on the elements of his FMLA interference claim that he has to prove" and also moved "for partial summary judgment on analogous elements in his discrimination/retaliation claims."  (Pl.'s Mem. Supp. Mot. Summ. J. 3.)  In addition, Plaintiff asserts that he "should be granted full summary judgment on his interference claim." (Id. at 21.)

[2] The recitation of facts in this Opinion is compiled from a review of the parties' statements of facts, responses in opposition to the parties' respective statements of facts, briefs, and the evidence submitted in conjunction with those briefs.  To the extent the parties allege a fact that is unsupported by record evidence, the Court does not include it in the recitation of facts.  Where the parties have specifically cited exhibits attached to their briefs and other submissions, the Court has reviewed and considered those cited materials.  See Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

In general, where Plaintiff cites only his Second Affidavit in support of his denials of Defendant's statements of fact—and where (1) Defendant's statements of fact are otherwise supported by record evidence; (2) Plaintiff's Second Affidavit contradicts Plaintiff's prior deposition testimony without providing sufficient explanation for the discrepancy; and/or (3) the factual assertions in Plaintiff's Second Affidavit are actually Plaintiff's opinions or speculations—the Court does not include such assertions as part of the recitation of facts. <u>See, e.g.</u>, <u>Blair v. Scott Specialty Gases</u>, 283 F.3d 595, 608 (3d Cir. 2002) ("In order to satisfy the standard for summary judgment 'the affiant must ordinarily set forth facts, rather than opinions or conclusions. An affidavit that is 'essentially conclusory' and lacking in specific facts is inadequate to satisfy the movant [or non-movant]'s burden.'") (quoting <u>Maldonado v. Ramirez</u>, 757 F.2d 48, 51 (3d Cir. 1985) (internal quotation omitted)). Defendant argues that Plaintiff's affidavits are "sham affidavits" which may be disregarded entirely by the Court. (<u>See</u> Def.'s Resp. Opp'n Pl.'s Mot. Summ. J. 16–19; Def.'s Reply 6–7.) The Court does not engage in a formal discussion of whether Plaintiff's affidavits rise to the level of a "sham affidavit" under the case law in this Circuit, because Plaintiff offers some explanation for certain of the contradictions between his deposition testimony and the statements in his affidavits. <u>See, e.g.</u>, <u>EBC, Inc. v. Clark Bldg. Sys., Inc.</u>, 618 F.3d 253, 268–69 (3d Cir. 2010) (discussing the Third Circuit's line of cases concerning sham affidavits); <u>see also</u> <u>Baer v. Chase</u>, 392 F.3d 609, 624 (3d Cir. 2004) (noting the Third Circuit's prior holding that "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict.") (citing <u>Hackman v. Valley Fair</u>, 932 F.2d 239, 241 (3d Cir. 1991)). Instead, the Court notes in the fact section and throughout this Opinion where there are contradictions between Plaintiff's deposition testimony and statements in his affidavits, as well as any explanation Plaintiff provided for the discrepancies.

The Court has similarly approached Plaintiff's submission entitled "Disputed Genuine Issues of Material Fact," which consists of sixteen paragraphs, some of which include citation to record evidence but several of which do not. (<u>See generally</u> Pl.'s Disputed Genuine Issues of Material Fact ¶¶ 1–16.) That document also includes three additional numbered paragraphs presenting issues that Plaintiff characterizes as "not needing citation" but which Plaintiff believes require jury consideration. (<u>See</u> <u>id.</u> at 9, ¶¶ 1–3.) Generally, where the facts Plaintiff highlights in this document as "disputed genuine issues of material fact" are not facts, are not material, do not create a dispute of fact relevant to either of Plaintiff's claims, are not supported by record evidence, or are simply Plaintiff's opinion, they are not included in the Court's recitation of the facts. <u>See</u> Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion."); <u>see also</u> <u>Betts v. New Castle Youth Dev. Ctr.</u>, 621 F.3d 249, 252 (3d Cir. 2010) ("Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment.") (internal citation omitted); <u>Jones v. United Parcel Serv.</u>, 214 F.3d 402, 407 (3d Cir. 2000) ("At summary judgment, a plaintiff cannot rely on unsupported allegations, but must go

Plaintiff previously worked as an Interventional Radiology Technologist at Chester County Hospital.  (Pl.'s Proposed Undisputed Statement of Facts ("PPUSF") ¶ 1.)  Sue Lombardo ("Lombardo") is an Interventional Radiology Supervisor who was Plaintiff's direct supervisor.  (Def.'s Statement of Undisputed Material Facts ("DSUMF") ¶4.)  Colleen Scelsa ("Scelsa"), the Administrative Director of Radiology, supervises Lombardo and reports directly to Carl Adkins ("Adkins"), the Vice President of Ancillary Services, who oversees seven other departments in addition to the Interventional Radiology ("IR") Department.  (Id. ¶¶ 5–6.) Thomas Quinn, M.D. ("Quinn"), was Defendant's Director of IR, but is not Defendant's employee—rather, Quinn is an employee of Community Radiology Associates within the University of Pennsylvania Health System.  (Id. ¶ 7.)  As such, Quinn does not have authority over Defendant's employees, nor did he formally evaluate them.[3]  (Id.)

Plaintiff asserts that, prior to "May/June 2012," he had not received any disciplinary write-ups or Action Forms.[4]  (PPUSF ¶¶ 25, 27.)  On May 18, 2012, Plaintiff and Quinn got into

---

beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial.") (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).

[3] Plaintiff "denies" Defendant's contention that Quinn did not have authority over Defendant's employees, because (1) Lombardo testified at her deposition that she did not know if doctors were technically Defendant's employees; (2) she did not know if Quinn could give non-medical orders; (3) Quinn evaluated Lombardo in writing; and (4) "[l]ike Lombardo, Plaintiff was never told the extent of Quinn's authority and everyone assumed he was the ultimate boss and in charge [and that] [d]octors in a Chester County Hospital are typically in charge."  (Pl.'s Resp. Opp'n to DSUMF ¶ 7.)  Plaintiff's subjective beliefs about doctors' roles within the Chester County Hospital system, however, are not facts.  In addition, Lombardo's lack of specific knowledge, and Plaintiff's personal assumptions, about Quinn's authority over particular categories of employees do not create genuine issues of material fact with respect to Plaintiff's FMLA claims.

[4] In fact, in 2003 Plaintiff was suspended without pay for accumulating multiple parking violations within a certain time period.  (See Def.'s Resp. Opp'n to PPUSF ¶ 25; Ex. X, Parking Citations and related memoranda.)  While the parking violations and related suspension are immaterial and temporally remote to the facts of this case, they do contradict Plaintiff's assertion that he had never received any written forms of discipline during his employment with

an argument because Plaintiff did not have things prepared for a procedure and Quinn believed that Plaintiff's unpreparedness led to "less than optimal patient care." (DSUMF ¶ 9.) Quinn and Plaintiff reported conflicting versions of events regarding the incident to Defendant's other employees. (DSUMF ¶¶ 10, 13; Pl.'s Resp. Opp'n to DSUMF ¶¶ 9–10.) Plaintiff received a written warning related to the incident,[5] and in response, Plaintiff submitted a statement describing his version of events to Defendant, which Scelsa later shared with Quinn.[6] (DSUMF ¶¶ 11–14.) Because Quinn believed Plaintiff's statement contained falsehoods, Quinn no longer trusted Plaintiff and their professional relationship devolved to one that Lombardo described as "tense," "unpleasant," and "toxic."[7] (Id. ¶¶ 15, 20, 21.) Quinn would not work alone with

---

Defendant. The Court notes that Plaintiff subsequently referred to the parking violations in his Response in Opposition to Defendant's Motion for Summary Judgment. (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 4.)

[5] Plaintiff asserts that Defendant "retaliated on Quinn's behalf" by disciplining him after the incident "because Quinn felt Plaintiff was not sufficiently obsequious and was angered that Plaintiff wrote up a version of events that differed from Quinn's and submitted it to HR." (Pl.'s Resp. Opp'n to DSUMF ¶ 11.) Plaintiff's personal opinion, however, is not a "fact."

[6] Plaintiff claims that "Scelsa told Plaintiff that when [Quinn] read Plaintiff's statement, [he] told Scelsa he wanted to fire Plaintiff the same day," but cites only his own Second Affidavit in support of that assertion. (See Pl.'s Resp. Opp'n to DSUMF ¶ 13 (citing Pl.'s Resp. Opp'n Def.'s Mot. Summ. J., Ex. O, Second Affidavit of Patrick Duncan, Feb. 27, 2015 ("Second Plaintiff Aff.") ¶ 13).)

[7] Plaintiff argues that there is a genuine issue of fact regarding Quinn's treatment of him, based on Quinn's opinion of his own conduct towards Plaintiff and how Quinn described it, in contrast with Plaintiff's perception of Quinn's behavior and Lombardo's description of Quinn's behavior. (See Pl.'s Disputed Genuine Issues of Material Fact ¶ 3.) Plaintiff asserts that "Lombardo blamed Quinn for the relationship problem with Plaintiff." (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 14 (citing Deposition of Susan Lombardo, Sept. 30, 2014 ("Lombardo Dep.") 84).) Lombardo testified that the workplace was "toxic" because Quinn avoided Plaintiff, which caused tension and low morale in the department. (See Lombardo Dep. 84:4–23.) Actual attribution of blame was not part of her testimony. While Plaintiff and Lombardo used different words to describe Quinn's behavior, Quinn testified that "there was a change in [his] relationship with [Plaintiff] after the events of May of 2012" whereby he avoided being alone with Plaintiff because he did not trust him and thus tried to limit his exposure to Plaintiff. (See Deposition of Thomas Quinn, M.D., Oct. 17, 2014 ("Quinn Dep.") 60:10–19.) Quinn also testified that he

Plaintiff and spoke very little to him unless it was patient-related, apparently in order to limit his exposure to any further claims against him from Plaintiff.  (Id. ¶¶ 18–19, 21–22; Deposition of Thomas Quinn, M.D., Oct. 17, 2014 ("Quinn Dep.") 60:10–19.)  Plaintiff testified at his deposition that, beginning in June 2012:

- Plaintiff and Quinn had communication problems;
- Plaintiff believed that Quinn avoided him at all costs;
- Quinn would leave the central room of the IR area in order to avoid interacting with Plaintiff;
- Quinn stopped entering the central IR room (where Plaintiff's desk was located) so that he would not have to see or speak with Plaintiff;
- Plaintiff was required to present Quinn with handwritten notes related to patient care because Quinn would not speak with him;
- Quinn completely avoided Plaintiff; and
- Quinn made Plaintiff write out the day's schedule and deliver it to his office rather than deliver it to him verbally.

(DSUMF ¶¶ 23–29 (citing Deposition of Patrick Duncan, Aug. 20, 2014 ("Plaintiff Dep.") 115:13–120:15, 126:19–129:5).)  At Plaintiff's deposition, when asked whether other people treated him differently because of Quinn's behavior towards him, Plaintiff testified that "[e]verybody was professional, but it was not until after I submitted my FMLA that things ramped up."[8]  (Plaintiff Dep. 122:12–19.)  However, Plaintiff also testified at his deposition that,

---

"tried to do it in a way that was professional," but that he "was told at one point that I could make more of an effort to be more cordial."  (Id. at 60:20–22.)

    For purposes of Plaintiff's claims, the words that Quinn used at his deposition to describe his conduct towards Plaintiff do not create a material factual issue, because the issue is not the precise degree to which Quinn's behavior was hostile, or how Quinn would describe it.  Rather, the pertinent issue regarding Quinn's behavior towards Plaintiff is whether the conduct itself is relevant to Plaintiff's FMLA retaliation claim, an issue discussed more fully below.

    [8] Plaintiff believes that towards the end of his employment "fellow employees shunned [him] because they knew he was being targeted."  (Pl.'s Resp. Opp'n to DSUMF ¶ 39 (citing Plaintiff Dep. 120–122; Second Plaintiff Aff. ¶ 16).)  Plaintiff also stated that he "felt" that "they were circling the wagons and getting people to dramatize things to fire me or get me to quit." (Second Plaintiff Aff. ¶ 11.)  As previously stated, Plaintiff's beliefs and opinions are not "facts."

after he emailed his request for FMLA leave to Scelsa in February 2013, he and Quinn had the same level of communication as in the preceding months.[9]  (DSUMF ¶ 39 (citing Plaintiff Dep. 139:12–19, 161:3–7).)  Plaintiff also testified that he did not know whether Quinn knew that he had requested FMLA leave.  (See Plaintiff Dep. 131:6–133:23.)

On February 19, 2013, Plaintiff met with Scelsa to express frustration with Quinn's behavior and the work environment in the IR Department.  (DSUMF ¶ 31.)  During their meeting, Plaintiff said that he wanted to leave the IR Department because of his working relationship with Quinn, or to only work part time in the IR Department in order to minimize the amount of time he had to work with Quinn.  (Id. ¶ 32 (citing Deposition of Colleen Scelsa, Sept. 30, 2014 ("Scelsa Dep.") 82:25–83:13).)  Plaintiff also told Scelsa that he was thinking about going back to school to get a CT/MR certification, and that if he continued his employment with Defendant, he wanted to work as a Radiology Tech Aide in another radiology department.  (Id. ¶ 33 (citing Scelsa Dep. 82:25–83:13).)

On February 20, 2013, Plaintiff spoke with Nancy Canfield, a Benefits Coordinator in Defendant's human resources department, regarding his need for future knee replacement surgery.  (DSUMF ¶ 35.)  On February 21, 2013, Plaintiff emailed Scelsa and Lombardo and stated that he intended to have knee replacement surgery at some point in the future.  (Id. ¶ 36.)  That same day, Plaintiff requested information and paperwork for possible FMLA leave relating

---

Plaintiff cites the same portion of his deposition testimony in support of his assertion that the treatment from Quinn got worse after he requested FMLA leave, but Plaintiff's testimony actually refers to the behavior of other people, not Quinn's behavior.  (See Pl.'s Resp. Opp'n DSUMF ¶ 16; Plaintiff Dep. 122:12–19.)

[9] Plaintiff now claims that "[a]fter my FMLA request, Dr. Quinn, who was 'cool' or 'very cool' became more obviously abrasive towards me" and that "[t]here had been no incident or event to explain Dr. Quinn's sudden change in behavior towards me other than my request for FMLA leave."  (Second Plaintiff Aff. ¶ 8.)  Plaintiff does not explain the difference between his deposition testimony and the assertions in his second affidavit.

to his knee, and was provided with a Leave of Absence Request and Agreement Form and a Certification of Health Care Provider for Employee's Serious Health Condition Form.[10] (Id. ¶ 38.) Plaintiff submitted the required paperwork, including a medical certification from his physician, Dr. Michael Maggitti, regarding his need for leave in order to have an operation for total knee replacement. (PPSUF ¶¶ 8, 10.) Dr. Maggitti returned the FMLA medical certification forms to Defendant on March 18, 2013. (DSUMF ¶ 60.) The operation was scheduled for April 16, 2013. (PPSUF ¶ 19.) Scelsa approved Plaintiff's request for FMLA leave on Defendant's behalf on March 19, 2013.[11] (PPSUF ¶¶ 13, 20; DSUMF ¶ 61.)

On or about February 26, 2013, Plaintiff was given a final written warning "concerning alleged deficiencies in the IR department," which was withdrawn after Plaintiff complained to Defendant's human resources department because of the delay between February 14, 2013, the date of the underlying incident, and his receipt of the warning. (PPUSF ¶¶ 29–31; DSUMF ¶

---

[10] In the fact section of his Complaint, Plaintiff claimed that "Defendant failed to give Plaintiff his individual FMLA notices once it acquired knowledge that Plaintiff needed FMLA leave as required by 29 C.F.R. § 825.300(b) and other regulations, including an Eligibility Notice, a Rights and Responsibility Notice, and a Designation Notice." (Compl. ¶ 14; see also Pl.'s Mem. Supp. Mot. Summ. J. 3, 5.) In support of his argument, Plaintiff cites only his first affidavit: "Defendant Chester County Hospital clearly approved my leave even though it *may* not have given me all the necessary FMLA forms that should have delineated my rights and responsibilities under the FMLA or otherwise complied with the FMLA." (Id., Ex. A, First Plaintiff Affidavit, Feb. 5, 2015 ("First Plaintiff Aff.") ¶ 23 (emphasis added).) Specifically, Plaintiff claims that Defendant did not provide him with a "proper ineligibility notice, a rights and responsibility notice, and a designation notice." (First Plaintiff Aff. ¶ 20.) Plaintiff's self-serving affidavit and its assertion that he may not have received the forms do not create a material issue of fact sufficient to substantiate his claim that his FMLA entitlements were interfered with. As noted above, Defendant promptly approved Plaintiff's leave request upon receipt of the medical certification form signed by Plaintiff's treating physician. Plaintiff has not demonstrated how any failure to provide these documents interfered with his success in obtaining FMLA leave approval from Defendant.

[11] Plaintiff's eligibility for FMLA benefits at the time of his leave request—based on his length of employment with Defendant, hours worked per week and during the preceding year, and the number of Defendant's employees—is not in dispute.

45.)  Plaintiff received the warning because Quinn observed Plaintiff contaminate a sterile tray before a patient procedure, and Quinn subsequently reported it to Lombardo.  (DSUMF ¶¶ 40–42.)  Lombardo later reported the incident to Scelsa upon Scelsa's return to work on February 19, 2013, and Scelsa presented Plaintiff with the warning on February 26, 2013.  (Id. ¶¶ 43–44.)  After the warning was withdrawn, Plaintiff instead received a Quality Action Form, which is a non-disciplinary form.[12]  (Id. ¶¶ 48, 50.)  Plaintiff testified at his deposition that, at the time he disputed the warning with human resources, he did not present his disagreement as being related to, or in retaliation for, his FMLA request.  (Plaintiff Dep. 232:14–233:16.)  As of the date of his deposition, however, Plaintiff believed the warning was in retaliation for requesting FMLA leave and that he was being harassed.  (Id.)

   At some point in the second half of 2012, Adkins recommended that Scelsa work with Jackie Felicetti ("Felicetti"), the head of human resources, to arrange a discussion between Quinn and Plaintiff about their working relationship, with Felicetti as a facilitator.  (PPUSF ¶ 32 (citing Pl.'s Mot. Summ. J., Ex. I, Deposition of Carl Adkins, Sept. 30, 2014 ("Adkins Dep.") 25:6–20).)  A meeting was eventually scheduled for March 13, 2013, at 7:30 a.m.  (PPUSF ¶ 34 (citing Pl.'s Mot. Summ. J., Ex. A, Affidavit of Patrick Duncan, Feb. 5, 2015 ("First Plaintiff Aff.") ¶ 31.)  According to Plaintiff, when he reported for the meeting at 7:10 a.m., he was first told to sit outside, and at around 8:00 a.m., he was told to come back that afternoon.  (First Plaintiff Aff. ¶¶ 32, 34.)  Plaintiff stated that he saw Quinn in the meeting and that Quinn and the

---

[12] Plaintiff "denies" that contaminating an item on the tray was worthy of either discipline or a Quality Action Form, asserts that it "would have been a minor breach of procedure," and claims that Quinn had ignored such breaches in the past.  (Affidavit of Patrick Duncan, Feb. 27, 2015 ("Second Plaintiff Aff.") ¶¶ 5–6.)  As stated previously, Plaintiff's unsupported opinions and assertions are not evidence.  See Betts, 621 F.3d at 252 ("Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment.") (internal citation omitted).

others met without him.  (Id. ¶¶ 33–34.)  When Plaintiff came back that afternoon, Felicetti told

him that Quinn would not meet with him and that she would try to resolve the situation.  (Id. ¶

35.)

During a regularly scheduled review of IR forms for the first quarter of 2013, Lombardo

found that Plaintiff had failed to document a patient's allergies on a sedation form (known as a

"time out form") and that Plaintiff had failed to sign a different time out form.[13]  (DSUMF ¶ 62.)

On March 20, 2013, Plaintiff was issued a Quality Action Form as a result of those failures.  (Id.

¶ 64.)[14]  Another employee also received a Quality Action Form for failing to complete a time

out form during the last quarter of 2012.  (Id. ¶ 66.)

On March 20, 2013, Scelsa met with Plaintiff regarding the Quality Action Form issued

in relation to the time out forms, the Quality Action Form Plaintiff received after he

contaminated a sterile tray on February 14, 2013, and conversations Plaintiff had with another of

Defendant's employees regarding Plaintiff's view of the working environment in the IR

---

[13] In Plaintiff's opinion, Lombardo had tired of the problems between Quinn and Plaintiff and she "treated [Plaintiff] differently after the FMLA leave request and tried to put him in catch-22 positions."  (Pl.'s Resp. Opp'n DSUMF ¶ 64 (citing Plaintiff Dep. 253:8–20).)

[14] In his Proposed Undisputed Statement of Facts, Plaintiff asserts that he "was given 2 or 3 Quality Action Forms (depending on whose views are believed) by Ms. Scelsa."  (PPUSF ¶ 39 (citing First Plaintiff Aff. ¶ 36).)

Plaintiff also asserts, as an undisputed fact, his belief that "the Action Forms were unwarranted and that Defendant was obviously picking on him."  (Id. ¶ 40 (citing First Plaintiff Aff. ¶ 37).)  Plaintiff testified at his deposition that, at the time he met with Scelsa about the Quality Action Forms, he did not mention a belief that his receipt of Quality Action Forms was connected to his request for FMLA leave.  (Def.'s Resp. Opp'n to PPUSF ¶ 40 (citing Plaintiff Dep. 276:24–279:8).)

Plaintiff also asserts that Scelsa had not given Quality Action Forms to other IR technologists prior to giving them to Plaintiff, even though another IR technologist received such forms from Scelsa around the same time.  (Id. at ¶ 41 (citing Pl.'s Mot. Summ. J., Ex. H, Deposition of Colleen Scelsa, Sept. 30, 2014 ("Scelsa Dep.") 75:1–11).)

Department.[15]  (DSUMF ¶ 67.)  Scelsa advised Plaintiff that, having received a Quality Action

Form, any subsequent infractions of Defendant's rules could lead to Plaintiff facing steps in the

disciplinary procedure.  (Scelsa Dep. 76:25–77:15.)  During that meeting, Plaintiff made several

remarks that he wanted to work in a different department, that he was considering not returning

to work the following week, and that he might or might not see her the following week.[16]

(DSUMF ¶¶ 68–74.)

    After his meeting with Scelsa, Plaintiff took some personal objects out of the workplace,

but left others behind.  (PPUSF ¶ 44 (citing First Plaintiff Aff. ¶ 39).)  Lombardo saw Plaintiff

remove his personal photos from the community board, take a phone cord that he always kept at

work, and slam a filing cabinet shut after removing something.  (DSUMF ¶¶ 75, 77.)  Plaintiff

asserts that he removed his personal photos "because of the way he was treated and no one

deserved to see the pictures."  (Pl.'s Resp. Opp'n to DSUMF ¶ 76.)  Lombardo contacted Scelsa

regarding what she had seen, and Scelsa in turn contacted Felicetti.  (Id. ¶ 77.)  Felicetti testified

at her deposition that because Plaintiff had become increasingly upset in the previous days, had

removed personal belongings from the workplace, and stated that he no longer wanted to be

employed in the IR Department, she terminated Plaintiff's work passwords.  (DSUMF ¶ 79.)

Felicetti also testified that it is Defendant's normal procedure to cancel passwords if an

_____

[15] Plaintiff discussed the working environment in the IR Department with another
employee, even though Felicetti had asked him to maintain confidentiality about the situation.
(See DSUMF ¶¶ 55–59 (citing Plaintiff Dep. 287:5–9; Def.'s Ex. Q (Plaintiff Dep. Ex. 10,
Pawlowski's Handwritten Notes regarding conversation with Plaintiff); Felicetti Dep. 112:23–
113:10, 114:9–10, 116:17–19).)  Plaintiff denies making certain remarks or including specifics
about Quinn during his conversation with the other employee, and asserts that Felicetti did not
give him guidance when she told him not to talk about "it."  (Second Plaintiff Aff. ¶¶ 9, 17.)

[16] Plaintiff disputes that this remark could be interpreted to mean that he was thinking of
quitting or resigning, and claims that his remark that he might not be at work on Monday was
connected to his "gut feeling he was being fired."  (Pl.'s Resp. Opp'n to DSUMF ¶ 71 (citing
Second Plaintiff Aff. ¶ 11).)

individual leaves work when they are very upset, and that it is easy to reactivate someone's

passwords.  (Id. ¶ 80.)  Later in the day on March 20, 2013, Felicetti called Plaintiff to ask him if

he had resigned, and Plaintiff told her that he had not resigned.  (PPUSF ¶ 45.)  On March 22,

2013, which was an approved scheduled day off for Plaintiff, Defendant requested Plaintiff's

attendance at a meeting at 3:00 p.m.  (PPUSF ¶ 46; DSUMF ¶ 83.)

Plaintiff attended the March 22, 2013 meeting, along with Felicetti and Adkins.

(DSUMF  ¶ 85.)  During the meeting, Plaintiff stated that he had not resigned on March 20,

2013, but also stated that he no longer wanted to work in the IR Department.  (DSUMF  ¶ 86.)

He also indicated that he wanted to either transfer or work part-time, and that he wanted to either

pursue additional education or be considered for an entry-level tech aide position.  (Id. at ¶¶ 86–

87 (citing Plaintiff Dep. 316:6–15; Adkins Dep. 18:4–6, 30:17–20, 54:2–12; Felicetti Dep.

20:20–21:1; Def.'s Ex. U, Adkin Notes.)  Plaintiff refused to answer Felicetti's questions

regarding whether he had spoken with another of Defendant's employees about the work

environment issues Plaintiff had been experiencing.[17]  (DSUMF ¶¶ 88–90.)  At the end of the

meeting, Plaintiff said "goodbye, it's been a great run."  (Id. ¶ 92 (citing Felicetti Dep. 166:18;

Plaintiff Dep. 318:24–319:2).)  At that point, Felicetti asked Plaintiff not to report to work until

she contacted him.[18]  (DSUMF ¶ 93 (citing Felicetti Dep. 166:20–21).)

---

[17] Plaintiff asserts that he "did not lie" but "was somewhat evasive and careful because he was being targeted."  (Pl.'s Resp. Opp'n to DSUMF ¶ 89 (citing Second Plaintiff Aff. ¶ 17).)

[18] Plaintiff "does not know what went on privately among [Defendant's] managers regarding the process and timing of termination," but "believes that the circumstantial evidence suggests [Defendant] was going to fire [him] *before March 22* . . . ."  (Pl.'s Resp. Opp'n to DSUMF ¶ 94 (emphasis in original).)  Plaintiff asserts, therefore, that there is a genuine issue of material fact as to when Defendant actually made the decision to fire him.  (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 15.)  Felicetti initially testified at her deposition that she first discussed the issue with Adkins on March 21, 2013, but later in her deposition, after speaking with counsel, she corrected her testimony to state that she had that discussion with Adkins on March 22, 2013. (Felicetti Dep. 156:6–164:20.)  She also stated that she wanted to meet with Plaintiff prior to

On March 26, 2013, Plaintiff was terminated from his employment with Defendant.

(PPUSF ¶ 21.)  Felicetti, Scelsa, and Adkins made the decision to terminate Plaintiff's

employment based upon Plaintiff's behavior generally, his behavior following the March 20,

2013 meeting, his expressed desire not to remain in the IR Department, and the ongoing issues

Plaintiff experienced with Quinn.  (DSUMF ¶ 95 (citing Adkins Dep. 14:7–9, 40:23–41:5).)

Quinn testified at his deposition that he was not consulted on Plaintiff being fired, and that he did

not suggest that Plaintiff be let go, laid off, or terminated.  (Quinn Dep. 67:19–68:5.)

Felicetti told Plaintiff on March 26, 2013 that he would no longer be actively employed

with Defendant, but that Defendant was prepared to help him and his family with benefits.

(DSUMF ¶ 98 (citing Felicetti Dep. 181:23–182:3).)  Adkins testified at his deposition that

Felicetti wanted Plaintiff to be able to have the knee surgery and wanted to ensure that

Defendant's health insurance would cover it.  (DSUMF ¶ 99 (citing Adkins Dep. 41:14–21).)

Since Plaintiff had already been approved for FMLA leave, Defendant provided Plaintiff with a

letter dated March 26, 2013, explaining that (1) if Plaintiff had his knee surgery any time before

April 30, 2013 (two weeks after the date of Plaintiff's scheduled surgery), he would be permitted

---

making a final determination regarding his continued employment.  (Pl.'s Resp. Opp'n Def.'s
Mot. Summ. J. 15 (citing Felicetti Dep. 156:6–164:20).)  As Plaintiff notes, Felicetti attributed
the change to the fact that she was "a little bit tired," but Plaintiff omits the part of her testimony
where she notes that she had by then been in the deposition for seven or eight hours.  (See
Felicetti Dep. 162:20–21.)

Whether Felicetti spoke with Adkins or legal counsel on March 21 or March 22, and how
far along Felicetti had come in reaching the ultimate decision to terminate Plaintiff's
employment between March 20, 2013 when she spoke with Plaintiff on the phone and the
conclusion of the meeting with Plaintiff on March 22, 2013, do not create genuine issues of
material fact with respect to Plaintiff's claims.  The fact issues relevant to Plaintiff's FMLA
claims concern (1) Defendant's motivation for firing Plaintiff, i.e., whether Plaintiff would have
been fired regardless of his FMLA leave request; and (2) Defendant's alleged retaliatory conduct
and whether there is sufficient temporal proximity between any adverse employment actions and
Plaintiff's FMLA leave request to support a causal connection between them.  A difference of
one day is not, under the circumstances of this case, outcome determinative.  Thus, the
discrepancy in Felicetti's deposition testimony is not a disputed issue of material fact for
purposes of summary judgment.

to take a full 12-week FMLA leave, with benefits, regardless of whether he executed a Release of Claims ("Release") arising out of his employment with Defendant; and (2) if Plaintiff decided not to have the surgery, or if he postponed the surgery to a date after April 30, 2013, his unpaid leave and employment would terminate on April 30, 2013.  (DSUMF ¶¶ 100–01; Ex. V, March 26, 2013 Letter and Release.)  The letter also explained that if Plaintiff signed the Release, he would be paid at his regular rate from the date of his termination up until the date of his then-scheduled surgery date of April 16, 2013, but that if he did not sign the Release, he would not be paid for the time between his termination and the date of his surgery.  (DSUMF ¶ 100 n.2; Ex. V.)  Plaintiff testified at his deposition that he understood he did not have to sign the Release in order to use his approved FMLA leave.  (Plaintiff Dep. 329:24–331:3.)  Plaintiff did not sign the Release.  (DSUMF ¶ 104.)

     At some point, but on a date that Plaintiff did not recall, he cancelled his scheduled knee surgery.  (Plaintiff Dep. 79:11–15, 79:23–24.)  According to Plaintiff's deposition testimony, he cancelled his knee surgery when he was at Dr. Maggitti's office for an appointment.  (Id. 79:11–15, 79:23–24.)  Plaintiff's medical records reflect that Plaintiff last visited Dr. Maggitti's office on February 27, 2013, and March 15, 2014—appointments which occurred prior to the date on which Defendant told Plaintiff his employment was terminated.  (DSUMF ¶ 109–10; Ex. W, Dr. Maggitti's Medical Records for Plaintiff.)  Plaintiff also testified at his deposition that he told either Dr. Maggitti or Dr. Maggitti's nurse that he was cancelling the surgery because he was no longer employed.  (Plaintiff Dep. 79:11–83:17.)  Plaintiff now admits that he is not sure "[h]ow and when" he cancelled his surgery, but he nonetheless asserts that it was not cancelled until after he was terminated.  (Pl.'s Resp. Opp'n to DSUMF ¶ 106.)  Plaintiff stated in his second affidavit that "I testified in my deposition that I thought I did it in person with Dr. Maggitti.  His

notes do not reflect such a meeting.  That is still my recollection and I cannot explain why his notes would not reflect what I recall other than he did not recall it or, given the passage of time, I may not be recalling it right.  However, I am certain that I cancelled it after my termination." (Second Plaintiff Aff. ¶ 1.)

Plaintiff's medical records include a document entitled "Total Knee Replacement Pre-Op Documentation" which was signed by Dr. Maggitti on April 4, 2013, but which does not have a date in a box at the top for "Date of Surgery."  (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J., Ex. P at Maggitti 033.)  On April 12, 2013, Plaintiff visited Paoli Hospital for blood work and radiology views of his knee, which Plaintiff asserts was "a diagnostic study (x-ray) in pre-op for his scheduled surgery."  (Pl.'s Resp. Opp'n to DSUMF ¶ 106 (citing Pl.'s Ex. P at Maggitti 061); Second Plaintiff Aff. ¶ 2.)  Plaintiff's wife submitted an affidavit in 2015 in which she stated that Defendant's claim that Plaintiff cancelled his surgery before April 12, 2013 is "ridiculous," that she "think[s]" that Plaintiff cancelled his surgery by phone, that she "believe[s]" she spoke with an office administrator at Dr. Maggitti's office "about whether it would be possible, having cancelled the surgery, for [Plaintiff] to get it at some other time," and that she "believe[s] this conversation occurred after [Plaintiff] had the pre-op testing."  (Affidavit of Janet Duncan, Feb. 27, 2015, ¶¶ 9–10.)

Plaintiff filed a Complaint in this case on March 3, 2014.  Plaintiff filed a Motion for Partial or Full Summary Judgment on February 9, 2015 and Defendant filed its own Motion for Summary Judgment on February 13, 2015.  Defendant filed a Response in Opposition to Plaintiff's Motion for Partial or Full Summary Judgment on February 26, 2015, and Plaintiff filed a Response in Opposition to Defendant's Motion for Summary Judgment on March 4, 2015. Defendant filed a Reply on April 2, 2015.  Plaintiff filed a Memorandum of Law Supplementing

His Summary Judgment Positions on March 2, 2016, to which Defendant responded on March 9, 2016.[19]   The parties' Motions for Summary Judgment are now ripe for judicial consideration.

## II.   STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is

---

[19] Plaintiff moved for leave to file supplemental briefing on the application of the Third Circuit Court of Appeals' decision in Hansler v. Lehigh Valley Hospital Network, 798 F.3d 149 (3d Cir. 2015) to his FMLA interference claim.  The Court has reviewed and considered the arguments of both parties on this issue, but finds that Plaintiff's reliance on Hansler is misplaced in light of the nature of his claims.

First, the holding in Hansler concerns the statutory requirement that an employer provide written notice with an opportunity to cure when an employee submits an insufficient medical certification in support of an FMLA leave request.  There, the court stated that "in 'any circumstance where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee . . . to ascertain whether leave is potentially FMLA-qualifying.'"  Id. at 153 (quoting 29 C.F.R. § 825.301(a)).  "In addition, an employer 'shall advise an employee whenever the employer finds a certification incomplete or insufficient, and shall state in writing what additional information is necessary to make the certification complete and sufficient.'"  Id. (quoting 29 C.F.R. § 825.305(c)).  "A certification is 'incomplete' if the 'employer receives a certification, but one or more of the applicable entries have not been completed.'"  Id. (quoting 29 C.F.R. § 825.305(c)).  The Third Circuit held "that when a certification submitted by an employee is 'vague, ambiguous, or non-responsive' (or 'incomplete,' for that matter) as to any of the categories of information required under 29 U.S.C. § 2613(b), the employer 'shall advise [the] employee . . . what additional information is necessary to make the certification complete and sufficient' and 'must provide the employee with seven calendar days . . . to cure any such deficiency.'"  Id. at 155 (quoting 29 C.F.R. § 825.305(c)).  Thus, a plaintiff may premise an FMLA interference claim on an employer's alleged regulatory violation through failure to provide written notice and an opportunity to cure an incomplete or insufficient certification.  Id. at 156.  Here, Plaintiff's FMLA leave request was approved, and the sufficiency of his medical certification is not at issue.  Accordingly, Hansler's holding does not apply to the particular issues raised by Plaintiff's FMLA interference claim.

Second, as discussed more thoroughly below, Plaintiff's FMLA interference claim primarily states a claim for FMLA retaliation, and is therefore being dismissed as a matter of law because it is duplicative of the retaliation claim.  The Third Circuit's decision in Hansler does not speak to that particular legal issue, and therefore does not apply to the particular facts of Plaintiff's case.  The potentially non-duplicative aspect of Plaintiff's FMLA interference claim is related to alleged interference with job restoration, an issue which was likewise not addressed by the Third Circuit's holding in Hansler.

"material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

16

III.    **DISCUSSION**

After careful consideration, the Court first finds that Plaintiff is not entitled to summary judgment on his FMLA interference claim in Count One for two reasons.  First, the bulk of the claim may be dismissed because it is duplicative of his FMLA retaliation claim in Count Two. Second, Defendant is entitled to summary judgment on the remaining portion of the interference claim because Plaintiff would have been terminated even if he had not requested FMLA leave. The Court next finds that Defendant is also entitled to summary judgment on Plaintiff's FMLA retaliation claim in Count Two because Plaintiff failed to establish a prima facie case of retaliation and no reasonable fact-finder would be able to return a verdict in Plaintiff's favor. The Court discusses each of Plaintiff's claims in turn.

A.    **Count One: FMLA Interference**

Plaintiff asserts that he was entitled to FMLA benefits, but was denied them as a result of Defendant's interference with his FMLA rights.  (Compl. ¶¶ 38, 40.)  The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  To assert an FMLA interference claim, "the employee need not show that he was treated differently than others."  Callison v. City of Phila., 430 F.3d 117, 119 (3d Cir. 2005).  Rather, "[i]n order to assert a claim of deprivation of entitlements, the employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them."  Callison, 430 F.3d at 119 (citing 29 U.S.C. §§ 2612(a), 2614(a)).  "Further, the employer cannot justify its actions by establishing a legitimate business purpose for its decision."  Id. at 119–20.  Ultimately, "[a]n interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA."  Id. at 120.

"To make a claim of interference under the FMLA, a plaintiff must establish: (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA."  Ross v. Gilhuly, 755 F.3d 185, 191–92 (3d Cir. 2014) (citations omitted).

The Third Circuit Court of Appeals recently held that an FMLA plaintiff may not "go forward with an interference claim that is in form and substance . . . a claim for retaliation." Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 598 F. App'x 109, 114 (3d Cir. 2015) ("Lichtenstein II") (internal quotation marks omitted).  While the court had previously held that "firing an employee for a valid request for FMLA leave *may* constitute interference with the employee's FMLA rights as well as retaliation against the employee," Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009) (emphasis added), it had also subsequently noted that "[i]t is not clear to us that Erdman necessarily guarantees that plaintiffs have an automatic right to claim interference where . . . the claim is so clearly redundant to the retaliation claim." Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 312 n.25 (3d Cir. 2012) ("Lichtenstein I").  The plaintiff in the Lichtenstein cases claimed that her employer interfered with her right to take FMLA leave "by using 'these absences and/or requests for FMLA leave *as a negative factor* in its decision to termination her employment.'"  Lichtenstein II, 598 F. App'x at 114 (emphasis in original) (quoting Appellants' Br. 38.).  The plaintiff did "not claim that any benefits were actually withheld, thereby making her claim distinctly not one for interference as [the Third Circuit] defined such claims in Ross."  Id. (citing Ross, 755 F.3d at 192).

Here, Plaintiff alleged that Defendant interfered with his FMLA rights (1) by disciplining and treating him differently, including by termination, "because of" his assertion and invocation of FMLA rights; (2) using his "articulation of a need for FMLA leave and his invocation of his FMLA rights [as] a negative factor in his adverse treatment, including his additional discipline . . . and his termination;" and (3) "by providing additional discipline to Plaintiff and terminating Plaintiff and not properly designating his leave" as FMLA.[20]  (Compl. ¶¶ 39, 41, 44.)  In other words, Plaintiff's claim for "interference" is based on allegations that Defendant took adverse employment actions against him "because of" his invocation of FMLA rights.[21]  As in the Lichtenstein cases, therefore, Plaintiff's interference claim is actually a claim of retaliation.  The conclusory allegations in the Complaint—that Plaintiff "was entitled to FMLA benefits and was denied them" and that "Defendant's conduct interfered" with Plaintiff's FMLA rights (Compl. ¶¶ 38, 40)—do not distinguish Plaintiff's interference claim from a retaliation claim because they are supported by specific allegations that constitute a retaliation claim.  Similar to the facts in the Lichtenstein cases, where the plaintiff did not actually claim that any FMLA benefits were withheld, Defendant actually approved Plaintiff's FMLA leave request, and was prepared to continue his health benefits for the already-approved FMLA leave period even after he was

---

[20] Plaintiff's claim that Defendant did not properly designate his leave as FMLA leave is not supported by the record evidence.  Defendant approved Plaintiff's FMLA leave request and referred to it as FMLA leave in the March 26, 2013 letter explaining that Defendant was willing to cover Plaintiff's health benefits during his already-approved period of FMLA leave, and that his employment would not officially terminate until at least April 30, 2013, even if he did not sign the Release.

[21] Similarly, Plaintiff's motion for full summary judgment on his interference claim is based on "the time line of what occurred after he requested FMLA leave, the trivial reasons articulated for termination, the failure to follow the Progressive Disciplinary System, and the fact [that] Plaintiff's immediate supervisors (Quinn and Lombardo) testified he was not fired because of his performance."  (Pl.'s Mem. Supp. Mot. Summ. J. at 22.)  These arguments support Plaintiff's theory of the case concerning his FMLA retaliation claim, rather than an interference claim.

terminated.  In sum, based on the allegations in the Complaint, Plaintiff's FMLA interference claim is "clearly redundant" to his retaliation claim because his "interference" allegations concern, and are tied to, allegedly retaliatory conduct.  See "Lichtenstein I" at 312 n.25.

There is one possible exception as to the redundancy of Plaintiff's interference claim, which concerns Plaintiff's allegations regarding his right to reinstatement following FMLA leave.  "When an employee returns from FMLA leave, the employer must restore the employee to the same or equivalent position he held, with equivalent benefits and with conditions of employment comparable to those he had when he left."  Ross, 755 F.3d at 191 (citing 29 U.S.C. § 2614(a)).  As the Third Circuit has noted, "it would be patently absurd if an employer who wished to punish an employee for taking FMLA leave could avoid liability simply by firing the employee before the leave begins."  Erdman, 582 F.3d at 508.  "But the question is not whether an employer may escape liability altogether; the question is whether such action constitutes interference with the employee's FMLA rights, retaliation against the employee, or both."  Id. Plainly, an employee who is fired after requesting FMLA leave but before the leave begins could potentially recover for retaliation, because the Third Circuit considers "taking" FMLA leave as both invoking those rights and actually commencing leave.  See id. at 509 (stating that "this Court has never held that an employee fired after requesting FMLA leave but before the leave begins cannot recover for retaliation" and that "we interpret the requirement that an employee 'take' FMLA leave to connote invocation of FMLA rights, not actual commencement of leave."). As for interference, the Third Circuit has previously noted that "if an employee is discharged during or at the end of a protected leave for a reason unrelated to the leave, there is no right to reinstatement."  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 141 (3d Cir. 2004)

(citing 29 C.F.R. § 825.216(a)[22]), holding modified by Erdman v. Nationwide Ins. Co., 582 F.3d

500 (3d Cir. 2009).  Stated differently, "the FMLA does not provide employees with a right

against termination for a reason other than interference with rights under the FMLA."  Sarnowski

v. Air Brooke Limousine, Inc., 510 F.3d 398, 403 (3d Cir. 2007) (citing 29 U.S.C. §

2614(a)(3)(B)[23]).

In this case, Plaintiff was terminated before his approved leave was scheduled to

commence.  As discussed above, Defendant offered to continue providing Plaintiff's health

benefits during the previously-approved FMLA leave period, but it would no longer employ

Plaintiff following the conclusion of the leave period.  Thus, it is arguable that Plaintiff's right to

reinstatement following his leave could be considered as having been withheld.  At the same

time, however, the right to reinstatement was "withheld" "because of" the allegedly retaliatory

termination and other adverse employment actions, as Plaintiff himself repeatedly framed the

issue in the Complaint.  For example, Plaintiff alleged that (1) "Defendant perpetrated specific

activity towards Plaintiff from February 18, 2013 onwards to interfere with his FMLA rights and

to pre-emptively make an ongoing record of discipline against him and then terminate him to

pre-emptively deprive him of FMLA rights, including his right to reinstatement at an equivalent

position . . ."; (2) "terminating him as Defendant did on March 26, 2013 and offering a

settlement agreement and release before the full provision of FMLA rights has been concluded is

---

[22] 29 C.F.R. § 825.216(a) states that "[a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period.  An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment."

[23] 29 U.S.C.A. § 2614(a)(3)(B) provides that "[n]othing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."

inherently coercive and interferes with his FMLA rights and retaliation for assertion of FMLA rights;" and (3) "Defendant's conduct interfered with Plaintiff's FMLA rights and retaliated against him for invoking them, including but not limited to his right to reinstatement."  (Compl. ¶¶ 27, 29, 30.)  These reinstatement-specific allegations are, in form and substance, allegations that Defendant retaliated against Plaintiff and that as a result, he lost his right to reinstatement following FMLA leave.

Elsewhere in the Complaint, however, Plaintiff alleged that "[i]ntent is not necessary to establish interference under the FMLA" but that, "[a]lternatively, Defendant intended to deprive Plaintiff of rights under the FMLA, including the right to reinstatement."  (Compl. ¶ 42–43.) Those paragraphs raise the issue of reinstatement without tying it to retaliation.  But even assuming that Plaintiff pled the job restoration aspect of his FMLA interference claim in a manner that is not duplicative of his retaliation claim, a reasonable jury could not find that Plaintiff would not otherwise have been fired from his job.  As discussed more fully below in connection with Plaintiff's retaliation claim, the record evidence shows that Defendant would have fired Plaintiff even if he had not requested, and received approval for, a period of FMLA leave for his knee surgery.[24]

Thus, in light of the above discussion, Defendant is entitled to summary judgment on Plaintiff's FMLA interference claim because (1) with respect to the majority of his allegations in Count One, it is in form and substance an FMLA retaliation claim; and (2) Plaintiff has not stated an interference claim for Defendant's failure to reinstate him to his position following the leave period because Defendant would have terminated his employment regardless of his FMLA leave

---

[24] As noted above, Plaintiff disputes Defendant's, and his own, earlier assertions that he cancelled the surgery before he was terminated.  When Plaintiff actually cancelled his surgery is not a material issue of fact for his interference claim, however—the issue is whether he would have been fired regardless of his FMLA needs.

request.[25]  Plaintiff's Motion for Partial or Full Summary Judgment on his FMLA interference

claim must therefore be denied, and Defendant's Motion for Summary Judgment on Plaintiff's

FMLA interference claim must be granted.

**B.**      **Count Two: FMLA Retaliation**

Plaintiff asserts that, after he invoked his right to FMLA benefits, he suffered adverse

employment actions or decisions that were causally related to his invocation and/or exercise of

FMLA rights.  (Compl. ¶¶ 48–50.)  Specifically, Plaintiff alleges that he was "unlawfully

terminated, retaliated, and otherwise discriminated against" because of his FMLA-protected

conduct.  (Id. ¶ 51.)

The FMLA provides that "[i]t shall be unlawful for any employer to interfere with,

restrain, or deny the exercise of or the attempt to exercise, any right provided under this

subchapter and that "[i]t shall be unlawful for any employer to discharge or in any other manner

discriminate against any individual for opposing any practice made unlawful by this subchapter."

29 U.S.C. § 2615(a)(1)–(2).  "Because FMLA retaliation claims require proof of the employer's

retaliatory intent, courts have assessed these claims through the lens of employment

discrimination law.  Accordingly, claims based on circumstantial evidence have been assessed

under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411

U.S. 792 (1973), while claims based on direct evidence have been assessed under the mixed-

motive framework set forth in Price Waterhouse v. Hopkins, 490 U.S. 228, 276–77 (1989)

(O'Connor, J., concurring)."  Lichtenstein I, 691 F.3d at 302.  In this case, the nature of

---

[25] The Court has reviewed all of the parties' various arguments in support of their
respective positions urging summary judgment in their favor on Count One.  For example, the
parties also disagree about whether, in light of Plaintiff's surgery being cancelled, any FMLA
benefits were actually withheld.  Having found that Plaintiff's FMLA interference claim is either
duplicative of his FMLA retaliation claim, or fails because Plaintiff would have been fired in the
absence of seeking FMLA leave, the Court does not discuss the parties' other arguments or their
merits.

Plaintiff's claim and supporting allegations requires application of the McDonnell Douglas burden-shifting framework.

Under the McDonnell Douglas model, the plaintiff is first required to set forth sufficient evidence to establish a prima facie case by showing that:  "(1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination."  Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008) (citing McDonnell Douglas, 411 U.S. at 802; Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1066 n.5 (3d Cir. 1996) (en banc)).  "[T]he elements of a prima facie case depend on the facts of the particular case."  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 411 (3d Cir. 1999).  To establish a prima facie case of FMLA retaliation, Plaintiff must show that "(1) []he invoked [his] right to FMLA-qualifying leave, (2) []he suffered an adverse employment decision, and (3) the adverse action was causally related to [his] invocation of rights."  Lichtenstein I, 691 F.3d at 302.

### 1.  **Prima Facie Case**

The record evidence shows that Plaintiff invoked his right to FMLA-qualifying leave by notifying Defendant of his need for knee surgery and by completing the related paperwork.  In addition, the evidence reveals that Plaintiff suffered an adverse employment decision when his employment with Defendant was terminated.[26]  Thus, the Court need only analyze the third

---

[26] Defendant argues that Plaintiff cannot demonstrate that he was engaged in FMLA-protected conduct because his reason for taking leave never occurred.  (See Def.'s Mem. Supp. Mot. Summ. J. 12–13.)  Even though Plaintiff's knee surgery ultimately never took place, Plaintiff requested FMLA leave and completed the necessary paperwork.  Thus, Plaintiff invoked his right to FMLA leave.  See Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009) (stating that "we interpret the requirement that an employee 'take' FMLA leave to connote invocation of FMLA rights, not actual commencement of leave.").

element of a prima facie case of FMLA retaliation—whether the adverse action was causally related to Plaintiff's invocation of FMLA rights.

"To demonstrate a prima facie case of causation, [a plaintiff] must point to evidence sufficient to create an inference that a causative link exists between [the] FMLA leave and [the] termination." Lichtenstein I, 691 F.3d at 307 (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279–81 (3d Cir. 2000)).  "When the 'temporal proximity' between the protected activity and adverse action is 'unduly suggestive,' this 'is sufficient standing alone to create an inference of causality and defeat summary judgment.'"  Id. (quoting LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007)).  "Where the temporal proximity is not 'unusually suggestive,' [courts must] ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'"  LeBoon, 503 F.3d at 232 (quoting Farrell, 206 F.3d at 280 (internal citation and quotation marks omitted)).  "Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." LeBoon, 503 F.3d at 232–33 (citing Farrell, 206 F.3d at 279–81); see also Reaves v. Pa. State Police, 597 F. App'x 92, 97 (3d Cir. Jan. 8, 2015) ("Such evidence may include a temporal proximity between the protected activity and the adverse action, antagonistic behavior on the part of the employer, inconsistencies in the employer's articulated reasons for taking the adverse action, or any other evidence that supports an inference of retaliatory animus.") (internal citations omitted).  Importantly, the Third Circuit has noted that "each case must be considered with a careful eye to the specific facts and circumstances encountered." Farrell, 206 F.3d at 279 n.5 (citation omitted).

### a. **Temporal Proximity**

As stated above, temporal proximity alone may be sufficient to establish a causal link and thus state a prima facie case of retaliation if it is unusually suggestive. See LeBoon, 503 F.3d 217, 232 ("[T]emporal proximity alone, when 'very close,' can in some instances establish a prima facie case of retaliation.") (citing Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001)). It bears emphasizing, however, that "'it is causation, not temporal proximity [or evidence of antagonism], that is an element of plaintiff's prima facie case, and temporal proximity [or antagonism] merely provides an evidentiary basis from which an inference can be drawn.'" Tenney v. City of Allentown, No. Civ.A.03-3471, 2004 WL 2755538, at *3 (E.D. Pa. Nov. 30, 2004) (quoting Farrell, 206 F.3d at 281).

The Third Circuit has previously found that a temporal proximity of two months between protected activity and an adverse employment action was not unduly suggestive. See Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004); but see Sgro v. Bloomberg L.P., 331 F. App'x 932, 936, 939 (3d Cir. 2009) (finding timing suggestive where the plaintiff initiated a federal lawsuit approximately six weeks before being terminated for refusing to increase his workload where the court also found that a reasonable jury could find that the employer's explanation was pretextual); but see also Fasold v. Justice, 409 F.3d 178, 190 (3d Cir. 2005) (finding a temporal proximity of "less than three months" could provide an evidentiary basis from which to draw an inference of retaliation) (citation omitted). Timing of a matter of days between protected activity and alleged retaliation, however, can support an inference of causation. See Williams, 380 F.3d at 760 (citing Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (finding that two days was suggestive and could support a prima facie case of causation); Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003) (finding

that ten days between a supervisor's comments that were suggestive of retaliation and an employee's termination, along with other evidence of retaliation, was sufficient to establish a prima facie case of causation)); see also Lichtenstein I, 691 F.3d at 307 (finding timing suggestive where termination occurred seven days after plaintiff invoked right to FMLA leave).

Here, the temporal proximity between Plaintiff's request for FMLA leave and his termination is not so suggestive that, by itself, it raises an inference of causation. Plaintiff initially spoke to human resources about FMLA leave on February 20, 2013, and notified his supervisors of his intentions regarding FMLA leave on February 21, 2013. Plaintiff's FMLA leave request was subsequently approved on March 19, 2013, the day after Plaintiff's physician returned the medical certification forms. Following meetings with supervisors on March 20 and 22, 2013, Plaintiff was notified that his employment was being terminated on March 26, 2013. Thus, while Plaintiff was formally terminated one week after his FMLA leave was officially approved, the termination occurred more than one month after Plaintiff first gave Defendant notice of his need for, and intention to take, FMLA leave. Importantly, the delay in approval appears to be based on the date on which Defendant ultimately received the certification from Plaintiff's treating physician. Given the unique facts of this case, therefore, a temporal proximity of one week between leave approval and termination, or one month between notice of intent to take FMLA leave and termination, is not unduly suggestive.

Since the temporal proximity between Plaintiff's FMLA leave request and his termination is not unduly suggestive, the Court will consider the record evidence as a whole. See LeBoon, 503 F.3d at 232 ("Where the temporal proximity is not 'unusually suggestive,' [courts must] ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'") (quoting Farrell, 206 F.3d at 280 (internal citation and quotation marks omitted)).

Specifically, the Court considers (1) whether there was any intervening antagonism on Defendant's part between the dates of Plaintiff's FMLA leave request and his termination, or any indications that Defendant acted with retaliatory animus; (2) any inconsistencies in Defendant's articulated reasons for terminating Plaintiff; and (3) any other evidence in the record sufficient to support an inference of retaliatory animus.  See LeBoon, 503 F.3d at 232–33 (citing Farrell, 206 F.3d at 279–81).

### b.  Intervening Antagonism and Retaliatory Animus

As stated above, more than one month elapsed between Plaintiff's notice to Defendant that he intended to take FMLA leave and Defendant's notification to Plaintiff that it was terminating his employment.  Nonetheless, "the 'mere passage of time is not legally conclusive proof against retaliation.'"  Washco v. Fed. Express Corp., 402 F. Supp. 2d 547, 560 (E.D. Pa. 2005) (quoting Robinson v. SEPTA, 982 F.2d 892, 894 (3d Cir. 1993)).  "Where a long period of time has passed between the protected activity and the adverse employment action, 'a plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.'"  Id. (quoting Woodson v. Scott Paper Co., 109 F.3d 913, 920–21 (3d Cir. 1997)).

Measuring from the date of Plaintiff's initial FMLA discussion with Defendant's human resources department on February 20, 2013, there were six events that Plaintiff now considers part of Defendant's antagonism:  (1) the February 26, 2013 written warning stemming from a contamination incident earlier that month; (2) the March 13, 2013 meeting where Quinn refused to meet with Plaintiff; (3) the issuance on March 20, 2013 of Quality Action Forms; (4) Scelsa's March 20, 2013 meeting with Plaintiff; (5) the termination of Plaintiff's work passwords and the subsequent phone call from Felicetti on March 20, 2013; and (6) the meeting between Plaintiff,

Felicetti, and Adkins on March 22, 2013.  Based on a careful review of the record evidence,
these events neither raise any factual inference of a pattern of intervening antagonism stemming
from Plaintiff's FMLA request, nor demonstrate retaliatory animus.  The Court discusses each of
the events identified by Plaintiff individually.

First, the written warning—which was ultimately withdrawn—was based on a
contamination incident that occurred on February 14, 2013, which was prior to the date Plaintiff
notified Defendant of his intent to take FMLA leave.[27]  While Plaintiff did not receive the
written warning until after making his FMLA request, the delay was due to one of his
supervisors being out of the office.  A reasonable jury, therefore, could not find that the written
warning stemming from the contamination incident was part of a pattern of antagonism or that it
demonstrated retaliatory animus.[28]

---

[27] Plaintiff asserts that, because Quinn did not obtain a new sterile tray after Plaintiff
contaminated it, there is a jury issue as to whether the discipline was retaliatory.  (Pl.'s Resp.
Opp'n Def.'s Mot. Summ. J. 5.)  Plaintiff cites only his Second Affidavit in support of his
assertion that Quinn did not do anything about the contamination and continued with the
procedure.  In light of the fact that the warning was ultimately withdrawn after Plaintiff
complained about the time delay between the contamination incident and his receipt of the
written warning, tangential details about what happened during the procedure after Plaintiff
contaminated the tray do not create genuine issues of material fact with respect to whether
Plaintiff has established a prima facie case of retaliation based on this event.

[28] Plaintiff claims that Quinn was involved in the decision to revoke the written warning,
but the record evidence he cites in support of that claim does not support his theory of events.
(See Pl.'s Disputed Genuine Issues of Material Fact ¶ 8 ("In the [March 13, 2013] meeting,
management including Quinn decided to revoke the Final Written Warning but Quinn then
refused to meet with Plaintiff.") (citing Felicetti Dep. 84:1–92:21; Scelsa Dep., Scelsa Ex. 6 at
1).)  Felicetti testified in her deposition that, during the March 13, 2013 meeting, "we may have
solidified again that it was not going to be a write up, just merely performance quality forms,"
that they would "reiterate that it wasn't going to be a write up; it was going to be education," that
she did not know whether Quinn knew prior to the meeting that the written warning would be
changed to a quality action form, and that "physicians in [Quinn's] role, they are not there to say
who gets written up or who doesn't . . . out of courtesy we might have made him aware.  But
whether he agreed or disagreed, that wouldn't have been our concern."  (Felicetti Dep., 85:19–
21, 87:20–22, 91:8–21, 92:11–16.)  Scelsa's notes reflect that she and Felicetti met with Plaintiff
on March 13 to discuss the outcome of the meeting with Quinn, and that she and Felicetti

Second, Plaintiff has not set forth any evidence to establish that Quinn's knowledge of Plaintiff's FMLA request was connected to his refusal to meet with Plaintiff on March 13, 2013. Plaintiff testified at his deposition that he did not know whether Quinn was even aware that he had requested FMLA leave.  (Plaintiff Dep. 131:6–133:23.)  Quinn testified that he knew Plaintiff had requested FMLA leave "sometime in early spring," but that he did not know the exact date.  (Quinn Dep. 33:22–25.)  Defendant set up the meeting to try to resolve the workplace tension between Quinn and Plaintiff, which tends to show that Defendant was working to try to improve Plaintiff's working conditions, not to retaliate against him.  Quinn's refusal to meet with Plaintiff on March 13, 2013 was consistent with the way Quinn had behaved towards Plaintiff since at least June of 2012.  Even if Quinn's distrust of and behavior towards Plaintiff on the date of that meeting could be attributed to Defendant, they cannot be reasonably inferred to be related to Plaintiff's FMLA request.  Thus, a reasonable jury could not find that the March 13, 2013 meeting was part of a pattern of antagonism or was evidence of retaliatory animus.

Third, the Quality Action Forms were issued based on events that occurred during the first quarter of 2013.  The specific forms that were not completely filled out, and for which Plaintiff received Quality Action Forms, were from patient procedures on January 10, 2013, and February 7, 2013.[29]  (DSUMF ¶ 62; Def.'s Ex. S, Plaintiff Dep., Ex. 5.)  At least one other employee also received a Quality Action Form around the same time.  The fact that Defendant

---

discussed with Plaintiff the decision to change the final written warning to a Quality Action Form.  (Scelsa Dep., Ex. 6.)  Plaintiff's interpretation of Felicetti's deposition testimony and Scelsa's notes is simply not accurate.

[29] Both of these errors occurred prior to Plaintiff requesting FMLA leave.

issued forms to educate Plaintiff on his errors after a quarterly review[30] of its employees'

paperwork does not establish that Defendant was engaging in a pattern of antagonism, nor does it

show retaliatory animus.  Plaintiff makes much of the fact that Scelsa was the one who presented

him with the Quality Action Forms, rather than a lower-level employee.  Plaintiff's opinion that

the infractions were "small items that were being dramatized into major issues by the way they

were presented to [him]," however, is not evidence sufficient to withstand a summary judgment

motion.  (See Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 15 (citing Second Plaintiff Aff. ¶ 9).)[31]

Again, the fact that Defendant generated written records and counseling forms as a result of

Plaintiff's errors on the job—errors which Plaintiff does not deny making[32]—is merely evidence

that Defendant documented its employees' mistakes, including those of Plaintiff, rather than

ignore them.  Plaintiff did not become immune from discipline or correction regarding his work

performance by making an FMLA leave request.  A reasonable jury could not find that

Defendant was engaging in a pattern of antagonism or acting with retaliatory animus, simply

because Defendant documented Plaintiff's mistakes in the time following his FMLA leave

request.

---

[30] Plaintiff states that he "[does not] know how [Lombardo] claims her review was 'regularly scheduled'" and that to his knowledge, "she did not give QA Forms to anyone and did not give any to me before my FMLA leave."  (Second Plaintiff Aff. ¶ 10.)  Plaintiff's opinion of whether Lombardo regularly conducted reviews of procedure forms that employees complete is not a fact on which he can rely in opposing Defendant's Motion for Summary Judgment.  Even if true, the fact that Plaintiff had not previously received a Quality Action Form from Lombardo is not evidence that these Quality Action Forms must, as Plaintiff claims, be in retaliation for his FMLA leave request.

[31] Plaintiff cites Paragraph Nine of his Second Affidavit, but he appears to be referencing content that actually appears in Paragraphs Ten and Eleven of that document.

[32] Plaintiff asserts that one of the omissions "could have been the fault of the nurse" because "[u]nder some circumstances, it was the responsibility of the person in the back who would do the ancillary service of signing the form because Plaintiff was supposed to be sterile at the time."  (See Pl.'s Resp. in Opp'n to DSUMF ¶¶ 63–64.)

Fourth, based on the record evidence submitted by the parties, Scelsa's meeting with Plaintiff on March 20, 2013 was a back-and-forth discussion between Plaintiff and Scelsa regarding the Quality Action Forms and their significance, as well as other topics including Plaintiff's desire to work in a different department and communications Plaintiff had with an employee in another department about Plaintiff's working environment.  Plaintiff characterizes the meeting as one which "was calculated to upset [him]" but cites only his own Second Affidavit in support of his assertion.[33]  (See Second Plaintiff Aff. ¶ 11.)  The record evidence, however, does not establish that it was some sort of punitive meeting intended to hassle Plaintiff.

Fifth, Plaintiff's work passwords were terminated based on his behavior following his meeting with Scelsa, including the removal of some of his personal items from the workplace as well as remarks that he made to other employees.  According to Defendant, the termination of those passwords was part of an easily-reversible procedure utilized if employees leave the workplace when they are very upset.  Plaintiff essentially argues that because his action in taking home personal items would not have been characterized as insubordination, Defendant should not have taken any action in response to that behavior.  (See, e.g., Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 17–18.)  But contrary to Plaintiff's view, an employer is not prohibited from taking precautionary measures, such as limiting network access if an employee leaves the workplace in an agitated state, simply because that employee has recently made a request for FMLA leave.  A

---

[33] The Third Circuit has previously observed "that 'conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.'"  Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009) (citing Blair v. Scott Specialty Gases, 283 F.3d 595, 608 (3d Cir. 2002)).  Rather, "the affiant must set forth specific facts that reveal a genuine issue of material fact."  Id. (citing Blair, 283 F.3d at 608; Maldonado v. Ramirez, 757 F.2d 48, 51 (3d Cir. 1985); Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial.")).

reasonable jury could not find that Defendant's reversible precautions in terminating Plaintiff's passwords under those circumstances was part of a pattern of antagonism or that it demonstrated retaliatory animus.

Finally, the meeting on March 22, 2013 appears to have been called in response to a culmination of problems Plaintiff had been having in the workplace.  Those problems include certain instances of Plaintiff's behavior during the previous year, including on March 20, 2013; Plaintiff's statements about his desire to work outside the IR department; and the ongoing tension between Quinn and Plaintiff.  Plaintiff argues that, because "Defendant acknowledges that Plaintiff did nothing insubordinate" during the March 22 meeting but he "winds up being fired" anyway, the meeting was "remarkable" and "unprecedented" and therefore evidence of retaliation.  (See Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 12.)  The absence of insubordinate conduct during that meeting, however, would not negate Defendant's ability to decide to terminate Plaintiff's employment on the basis of numerous other concerns.  In spite of Plaintiff's opinion regarding the "unprecedented" nature of the meeting, a reasonable jury could not find that the March 22, 2013 meeting was part of a pattern of ongoing antagonism or that it was evidence of retaliatory animus.

Whether viewed individually or in totality, these events show that Plaintiff was counseled regarding errors in the workplace, that there were ongoing discussions and attempts to resolve the workplace issues Plaintiff continued to experience with Quinn, and that Plaintiff's behavior and attitude at work had become problematic.  While Plaintiff repeatedly asserts that Defendant had not had problems with Plaintiff's workplace performance in the past, part of Defendant's motivation for convening the various meetings appears to be connected to Plaintiff's personality and behavior.  Plaintiff himself points out that his supervisor "concede[d] Plaintiff is more

33

sensitive than many employees." (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 3 n.2 (citing

Lombardo Dep. 38).)  Specifically, when Plaintiff's counsel asked Lombardo about her

observations regarding Plaintiff's ability to get upset about things, she said "[e]asily he gets

upset." (Lombardo Dep., 38:15–17.)  In addition, Defendant took several of the actions Plaintiff

complains of in whole or in part because of events that predate Plaintiff's FMLA leave request—

specifically, the contamination incident and subsequent related discussions, the incomplete time-

out forms and the Quality Action Forms that resulted, and conversations and meetings regarding

the problems between Plaintiff and Quinn.  Plaintiff argues that allowing the firing of an

employee who has been approved for FMLA leave for "subjective, non-disciplinary reasons"

"will be a disaster for the law if employers think the reasons here for termination will not lead to

poor consequences."[34]  (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 27–28.)  Plaintiff's argument,

however, goes too far—Defendant did not become barred from firing an at-will employee due to

workplace behavior and performance issues simply because that employee had been approved

for FMLA leave.

       In sum, and in light of the foregoing discussion, a reasonable jury could not find that

Defendant engaged in a pattern of antagonism or demonstrated retaliatory animus in its actions.

The Court finds, therefore, that Plaintiff has not established a prima facie case of retaliation

based on his assertions that the six events described above were antagonistic or demonstrate

retaliatory animus stemming from his FMLA leave request.

---

[34] Plaintiff also argues that, because Defendant did not "engage its own Progressive
Disciplinary System," Defendant cannot show that it would have fired him in the absence of his
FMLA request.  (See, e.g., Pl.'s Mot. Summ. J. 3.)  Defendant's progressive discipline policy,
however, states that Defendant "reserves the right to terminate employees at any time for any
reason."  (See Def.'s Reply 8 (citing Def.'s Ex. 6, Chester County Hospital's Employee
Performance Improvement Policy ¶ F).)  Thus, the fact that Defendant did not employ
progressive discipline prior to terminating Plaintiff for the stated reasons is not automatic proof
that Defendant acted in a retaliatory manner, nor does it prevent Defendant from arguing that it
would have fired Plaintiff even if he had not requested FMLA leave.

### c.  **Inconsistencies in the Reasons for Termination**

The Court next discusses whether there are any inconsistencies in Defendant's articulated reasons for terminating Plaintiff.  "Evidence that the employer gave inconsistent reasons for terminating the employee may be relied upon to show a connection between the protected activity and the adverse employment action."  Carter v. Potter, No. Civ.A.02-7326, 2004 WL 2958428, at *9 (E.D. Pa. Dec. 21, 2004) (citing Farrell, 206 F.3d at 281).

Plaintiff asserts that Defendant gave "subjective pretextual reasons"[35] for terminating his employment.  (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 17.)  Plaintiff considers the following "three areas of somewhat differing reasons for firing Plaintiff" as having been "dramatized" and as "pretexts for firing Plaintiff": (1) Plaintiff's activity over the last few days of his employment led to his termination, in part because he took home pictures and personal items and "allegedly" said he wasn't going to return; (2) Plaintiff "allegedly" said at one point that he did not want to be in his position in the IR department; and (3) Plaintiff's toxic relationship with Quinn.  (Id. at 17–19.)

In support of his assertions that Defendant's reasons for his termination were "pretextual," Plaintiff first argues that he was actually fired "because Quinn could not live with [Plaintiff's] FMLA request" and that "Defendant does not get to act on behalf of a FMLA retaliator to finish the job."  (See Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 17–18.)  Plaintiff's theory that Quinn was for some reason upset that Plaintiff was going to take FMLA leave, however, does not render Defendant's explanation for its decision to terminate Plaintiff

---

[35] Plaintiff repeatedly refers to Defendant's reasons as "pretext" or "pretextual" in his briefing, but it appears from Plaintiff's arguments that he intends this to mean that the reasons are inconsistent with each other and with Plaintiff's view of events.  Accordingly, Plaintiff's arguments are addressed here with respect to the various types of evidence which can establish a prima facie case of retaliation.

"inconsistent."  Whatever Quinn's feelings on Plaintiff's need for FMLA leave, such feelings would be independent of, and unrelated to, those aspects of Plaintiff's workplace conduct in the last weeks of Plaintiff's employment that Defendant found troubling.  Plaintiff asserts, without citation to the record, that "Quinn could not get over his retaliatory approach to Plaintiff, and [Defendant] implemented it."  (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 12.)  But there is simply not sufficient evidence in the record to enable a reasonable jury to reach such a conclusion.

Second, Plaintiff asserts that he only requested a transfer to a different department, and did not want to completely end his employment with Defendant.  (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 18.)  According to Plaintiff, because he was not fired after expressing his interest in a transfer to Scelsa on February, 19, 2013, there is a fact issue as to "pretext for retaliation."  (Id. at 18–19.)  Specifically, Plaintiff posits that "[i]t is puzzling why a request to management known at least a month before the termination is anything other than a pretext."  (Id. at 18.)  As discussed above, however, several events occurred subsequent to Plaintiff's meeting with Scelsa which led to Defendant's decision to terminate Plaintiff's employment.  The fact that Plaintiff was fired only after Defendant possessed multiple reasons for terminating Plaintiff's employment, rather than being fired immediately in response to expressing interest in transferring, does not mean that the reasons Defendant gave for the termination are "inconsistent" or a "pretext."

Finally, Plaintiff argues that the timing of his firing, which occurred after many months of the "toxic relationship" between himself and Quinn, demonstrates that Defendant is "being disingenuous by claiming that Plaintiff had a toxic work relationship with Quinn" because it was Quinn who had the problem, and because "[i]t was only when Plaintiff requested FMLA leave that Quinn took this situation to the next level and this suddenly became grounds for

termination." (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 19.) This argument fails on two levels. First, Plaintiff's repeated assertions that Quinn's behavior escalated following Plaintiff's FMLA request is not supported by the deposition testimony submitted by the parties. Second, Defendant would not be prevented from considering the problems between Plaintiff and Quinn in deciding whether to fire Plaintiff on that basis, simply because Quinn was aware of Plaintiff's FMLA request.

In sum, the reasons Defendant gave[36] for its decision to terminate Plaintiff's employment were not inconsistent over time or with each other, but rather represent an accumulation of reasons that ultimately led to the decision to fire Plaintiff. Accordingly, Plaintiff has not established a prima facie case of retaliation related to his FMLA leave request on the basis of inconsistent reasons for his termination.

### d.  Other Evidence

Finally, the Court addresses whether Plaintiff can rely on Defendant's March 26, 2013 letter—which detailed Plaintiff's various options in light of his termination and Defendant's proposed release of claims—in order to establish a prima facie case of FMLA retaliation. Plaintiff asserts that Defendant "tried to get Plaintiff to surrender his FMLA rights in exchange for a small severance package," (Pl.'s Mem. Supp. Mot. Summ. J. 18), and that Defendant's action in firing "an FMLA-approved individual and attempt[ing] to get him to sign a release of

---

[36] Plaintiff asserts that Defendant presented "belated claimed reasons" for Plaintiff's termination in its briefing, and that defense counsel's arguments are "first time claims" and therefore evidence of pretext. (See Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 15–16.) Defense counsel's use of the word "insubordination" as a means to illustrate a legal argument in a brief— filed nearly two years after Plaintiff was fired—does not negate or undermine the reasons offered by the specific employees who actually made the decision to fire Plaintiff.

all claims" is evidence that Defendant would not have been able to prove that Plaintiff would have lost his job had he not made a request for FMLA leave.  (Id. at 22.)

    As a preliminary matter, Plaintiff's current argument contradicts his deposition testimony, in which he stated that he understood that he did not have to sign the Release in order to use his FMLA leave and continue to receive health benefits long enough to cover the surgery. (See Plaintiff Dep. 329:24–331:3.)  Contrary to Plaintiff's current position, Defendant did not make Plaintiff's ability to have continued health benefits through the duration of the FMLA leave period contingent on Plaintiff signing the Release—rather, they were only contingent on him undergoing surgery prior to a certain date following his termination.  The fact that Defendant was going to provide Plaintiff with health benefits and a period of FMLA leave in spite of the termination of his employment, rather than simply firing him—as it can do with any at-will employee—is not evidence of retaliation.

    On the basis of the above discussion, the Court finds that Plaintiff has not established a prima facie case of retaliation in violation of the FMLA on the basis of temporal proximity, intervening antagonism or retaliatory animus, inconsistent reasons for his termination, or the other evidence Plaintiff identified as proof of retaliation.  As Plaintiff has not established a prima facie case of retaliation, the Court need not address the remaining stages of the burden-shifting analysis.  Accordingly, Defendant's Motion for Summary Judgment with respect to Count Two is granted.

## IV.    CONCLUSION

    In light of the foregoing, the Court finds that Plaintiff has not established the existence of genuine issues of material fact with respect to Counts One or Two.  Therefore, the Court must deny Plaintiff's Motion for Partial or Full Summary Judgment.  By contrast, and as discussed

above, the Court finds that Defendant has established its right to summary judgment as to both Count One and Count Two.

An appropriate Order follows.